## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| PATRICIA A. REYNOLDS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO. 14-00235-CG-N |
| | ) | |
| MEGAN BRENNAN,[1] | ) | |
| *United States Postmaster General* | ) | |
| | ) | |
| Defendant. | ) | |

## REPORT AND RECOMMENDATION

Pending before the Court is the Defendant's Motion to Dismiss or, in the Alternative, Motion for a More Definite Statement (Doc. 19) brought under FED. R. CIV. P. 12(b)(6) and 12(e). The Plaintiff, Patricia A. Reynolds, has timely filed a response in opposition (Doc. 23). The motion is now under submission and is ripe for adjudication. *See* Doc. 21. The present motion has been referred to the undersigned United States Magistrate Judge for entry of a report and recommendation under 28 U.S.C. § 636(b)(1)(B)-(C) and FED. R. CIV. P. 72(b)(1). Upon consideration, the undersigned **RECOMMENDS** that the Defendant's Motion to Dismiss (Doc. 19) be **DENIED** and the Defendant's Alternative Motion for a More Definite Statement (Doc. 19) be **GRANTED**.[2]

---

[1] Plaintiff sued Patrick Donahoe, the Postmaster General, in his official capacity in May 2014. Doc. 1. Megan Brennan was installed as the Postmaster General by the U.S. Postal Service Board of Governors effective February 1, 2015.

[2] The deadlines imposed by the Preliminary Scheduling Order (Doc. 20) have previously been stayed pending disposition of the present motion. Doc. 25. Should the recommendation of the undersigned be adopted, the Parties will have fourteen (14) days to confer and file a supplementary Rule 26(f) report proposing a further schedule for this case, per the previous Order of this Court. *Id.*

# I. <u>Applicable Legal Standards</u>

In deciding a motion to dismiss under Rule 12(b)(6) for "failure to state a claim upon which relief can be granted," the Court construes the complaint in the light most favorable to the plaintiff, "accepting all well-pleaded facts that are alleged therein to be true." *Miyahira v. Vitacost.com, Inc.*, 715 F.3d 1257, 1265 (11th Cir. 2013) (citing *Bickley v. Caremark RX, Inc.*, 461 F.3d 1325, 1328 (11th Cir. 2006)). " 'To survive . . . a complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." ' " *Id.* (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007))). "The plausibility standard 'calls for enough fact to raise a reasonable expectation that discovery will reveal evidence' of the defendant's liability." *Id.* (quoting *Twombly*, 550 U.S. at 556). "The plausibility standard is not akin to a 'probability requirement,' but [rather] asks for more than a sheer possibility that a defendant has acted unlawfully. Where a complaint pleads facts that are 'merely consistent with' a defendants liability, it 'stops short of the line between possibility and plausibility of 'entitlement to relief.' " *Iqbal*, 556 U.S. at 678, quoting *Twombly*, 550 U.S. at 556 (internal citations omitted). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—that the pleader is entitled to relief.' " *Iqbal*, 556 U.S. at 679, quoting in part FED. R. CIV. P. 8(a)(2).

Under Rule 12(e), "[a] party may move for a more definite statement of a pleading to which a responsive pleading is allowed but which is so vague or

ambiguous that the party cannot reasonably prepare a response. The motion must be made before filing a responsive pleading and must point out the defects complained of and the details desired." Whether to grant relief under Rule 12(e) is left to the Court's discretion. *See Porter v. Duval Cnty. Sch. Bd.*, 406 F. App'x 460, 461 (11th Cir. 2010) (per curiam) (unpublished) ("We review for abuse of discretion a district court's grant of a motion for a more definite statement." (citing *Mitchell v. E–Z Way Towers, Inc.,* 269 F.2d 126, 131 (5th Cir. 1959)).

## II.    Background

Plaintiff initiated this action on May 27, 2014, by filing a Complaint with the Court alleging a discrimination claim against the Postmaster General. *See* Doc. 1. It is unclear from the face of the Complaint what basis she alleges she was discriminated on. *Id.* The Court ordered that the Plaintiff file a supplement to her original Complaint "that clearly states the basis for the discrimination she alleges." Doc. 3 at 3. The Plaintiff responded to this Order with miscellaneous documents, but still failed to allege a plain basis for discrimination. *See* Docs. 5, 6. The following factual allegations[3] concerning the Plaintiff's employment with the United States Postal Service are accepted as true for purposes of the present motion:[4]

---

[3] Out of an abundance of caution concerning Ms. Reynolds's status as a *pro se* litigant, the Court gives credence, for the purpose of this Motion, both to the allegations made in her Complaint (Doc. 1) and to those made in her Response (Doc. 23) to the Defendant's present Motion. The Plaintiff's Response (Doc. 23) is construed as a supplement to her original Complaint (Doc. 1).

[4] The Supreme Court has stated in *Ashcroft v. Iqbal* (556 U.S. 662, 679 (2009)) that:

> [A] court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth. While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations. When there are well-pleaded factual

3

[Plaintiff] filed an EEOC discrimination claim against the U.S. Postal Service because they promoted 16 people over me during my 26 years of working at the post office in Atmore, Alabama. They knew that I wanted to be a Supervisor from the time that it was asked when I was hired in 1986. I was told that I would always be the next in line but was always overlooked and someone else was chosen. People were chosen from other offices and the office here. Carriers that I trained to carry mail so I could be trained as Supervisor were later chosen as Supervisor over me. I was told that I was not hired to be a Supervisor, I was hired to carry mail but all the other carriers could be trained to be Supervisors and they could also be carriers. Doc. 1 at 1-2.

Mrs. Hayes was Postmaster when I was hired . . . . I worked for 9 months and only missed 4 hours of work because I became sick at work with the flu . . . . After finishing my 9 months she walked me out the Post Office and told me that the Post Office did not need any more people like me there because one was enough (David McCants, he was the only other black in the office). I did tell Wendell Middleton, who was shop steward at the time and he told her she could not fire me because a dog bit me. Doc. 23 at 2.

Rudy Blystrock hired me on August 31, 1986 as a Clerk/Carrier . . . . It was during this time that Mr. Blystrock stated that anyone who wanted to [ ] move up in the Post Office, put it in writing and have a clerk stamp it and it into him and they will be trained. At that time only Patricia Stone and myself wrote out our wish to be trained. She began her training immediately because she was hired two months before me . . . . *Id.*

Gary Vincent came in as supervisor from the Brewton office and Patricia Stone was still being trained . . . . All during the time I was still doing clerk work and carrying mail and continuously asking to get some of the training . . . . *Id.*

Alfonse Russell came in as Supervisor after Gary Vincent left and [Plaintiff] asked the same question again about being trained as Supervisor. He told me that I needed other training and education to get trained and I didn't really know where this was coming. Patricia Stone was not told any of that . . . . Then I decided I would asked Mr. Russell what kind of training that I needed and he said that I needed to know all the aspects of the Postal Facility. I told him Patricia Stone didn't have to do this and he told me that her situation was different. I

---

allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief.

was never told what the difference was. I transferred into Mobile and started training with Billy Spence (deceased). I went through all the training there in Mobile, Mail Handler, LSM Operator, Flat Sorter OCR and BCS machines, OJT training. I also took all the Postal Courses that were offered in PEDC either before I started my shift or after my shift was over. This was while I was still going to college. I returned to Atmore after I was accepted into the University of Mobile. I had some courses to finish and I went to Faulkner Community College and obtain[ed] my AA in Liberal Arts. I started the University of Mobile the following January 1992 and finished in 1994. *Id.* at 2-3.

When I returned to Atmore, Betty Coker was Supervisor . . . . I asked her if I could used her 991 [Application for Promotion or Assignment] as a model to put one in for a Supervisor position. She allowed me to use it. I find that she was a letter carrier and had limited training in any area and no college but did some training in other areas. I took my 991 to several other Postmasters and asked them to go over it and help me to correct it. All of them thought that I had a very good 991 and didn't need any correction. I sent in several 991 job vacancies and never heard anything from them . . . . I found out later that the Postmaster and the supervisor had to fill out their recommendation for you to get into the program and not one of them filled out the paperwork for me. *Id.* at 3.

Jim Hoobler came in as Postmaster and Jeff Daniels as Supervisor. Again I asked to be trained as Supervisor. This is ten years of begging to be trained as Supervisor. As soon as a new clerk (PTF) came in within a year that person was being trained as supervisor. As soon as I would say something about asking or that I have been asking to be trained, I was told that a letter [carrier] cannot be a Supervisor, it was against policy . . . Then I learned that he [Hoobler] and the Supervisor had carried mail. I asked him again what was the reason that I couldn't be trained and then I was called names (Nigger), stupid, uneducated. I was belittled on every hand. I was told I would never sit behind that desk as long as he was Postmaster in that office . . . . Mr. Hoobler and Jeff Daniels made my life miserable. I was constantly being written up and after I filed the EEOC charges against them it got worst. Mr. Hoobler accused me of wrecking every [delivery vehicle] in the office. I was constantly being watched and written up. I kept putting in 991 for vacancies and never hearing back from Birmingham . . . . I was bitten [by] a bull dog and I was written up for that. Three pit bulls broke [ ] loose from their chains and . . . I had to climb up on top of the jeep to get away from them. I was written up for that. I stepped into a hold on Brown Street that I didn't know was there and .

5

. . I was put in a boot and on crutches. I was placed on light duty, no standing. Mr. Hoobler had me standing and cleaning a supply closet. Then I had to straighten[ ] out a filing cabinet. I laid my crutch next to the cabinet and Jeff Daniels threw my crutch across the floor and I couldn't get it. I was sent to Brewton, Ala., under Lynn Reeves for training but Mr. Hoobler kept calling saying I was needed back in Atmore . . . . When I returned to Atmore, I was not put on the schedule and had to use annual leave to make a pay check . . . . *Id.* at 4.

I filed my EEOC complaint against Mr. Hoobler and the Post Office in 1998 and the EEOC found in my favor and I took my claim to court because the Post Office would not train me and all I wanted was to be trained at the time . . . . My case was dismissed . . . . After that case was closed things got worse between Mr. Hoobler and myself. I was written up basically for everything or anything. I literally had to beg for time off, my 3971's [Request for or Notification of Absence] were denied, if I took a day off I had to have a reason for it or I had to come to work. I filed grievance after grievance in order to get him to leave me alone . . . . *Id.* at 4-5.

Lester Coggola became Supervisor after Jeff Daniels left. I immediately asked him about the training for 204-B (supervisor). Again I put it in writing and kept asking him about it. Jim Hoobler finally left the Atmore Office and Lester Coggola became Postmaster and from there we had a succession of supervisors. The more I asked him about the training, the more he kept putting me off. He would tell me I should wait my turn. He hires in Tonya Rabon as a PTF, I trained her [as] a letter carrier, he tells me as soon as she is trained I will be trained as a Supervisor, instead she was trained as a supervisor and when I asked him how did that happen since . . . [h]e tells me that I'm needed to carry the mail instead of being a supervisor. Then he started writing me up because I kept asking him why did he choose a PTF over me and I had the education and some of the training, he stated that the other people in the office didn't like me. He started quoting things that Jim Hoobler was saying to me about always having accidents and wrecking all the jeeps. He couldn't trust me. I lacked integrity to do things but he was going to coach [ ] me on the things that I need[ed] to learn. He never did any of this because he was lying. No one in the office said those things to him at all. I asked the entire office one morning and he was very upset that I would question what he said and that everyone called him a liar. He said that I misunderstood what he said. *Id.* at 5.

> Lester Cogolla kept bringing in people and training them in Supervisory positions from other offices . . . . I had been there in that office for nearly 20 years at that time and still I was not promoted and kept asking over and over, kept filing EEOC complaints . . . following proper procedures, and talking to the mediators and nothing happened. Mr. Cogolla kept telling me to wait my turn. Still calling me names, still writing me up, threatening me and trying to control my sick leave. He came to my home on several occasions to get me to come to work when that was my only day off in days . . . . He would tell us not to use our cell phones but would call me on my cell hoping that I would answer and I did not . . . . *Id.* at 6.

Based on the preceding factual allegations, Plaintiff asserts in her Complaint (Doc. 1) that she has been the object of "discrimination," and asserts in her Response (Doc. 23) that she "was systematically discriminated, intimidated, threatened, ridiculed, and harassed" during her employment with the U.S. Postal Service. Plaintiff does not make specific legal allegations, nor does she state specifically on what basis she has been discriminated. *See* Doc. 1, 23.

## III.   Analysis

"FED. R. CIV. P. 8(a)(2) requires that a pleading contain 'a short and plain statement of the claim showing that the pleader is entitled to relief' in order to 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.' " *American Dental Association v. Cigna Corporation*, 605 F. 3d 1283, 1288 (11th Cir. 2010), quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957). Additionally, a complaint must "contain either direct or inferential allegations respecting all the material elements necessary to sustain a recovery under some viable legal theory." *Randall v. Scott*, 610 F. 3d 701, 707 n.2 (11th Cir. 2010), quoting *Bryson v. Gonzalez*, 534 F. 3d 1282, 1286 (10th Cir. 2008) (internal quotation marks omitted).

Despite numerous filings concerning her employment experience with the United States Postal Service (see Docs. 1, 1-1, 5, 5-1, 6, 6-1, 23, 24), Plaintiff has failed to advance any legal theory, state any cause of action, or show why she is in entitled to the relief which she seeks ("The relief I am requesting is that I be made Postmaster with all benefits and retirement (retroactive) and a sum of $750,000 cash." Doc. 1 at 3). While her complaint mentions Title VII of the Civil Rights Act of 1964 and the Rehabilitation Act of 1973, she fails to allege the essential elements relating to any cause of action under either piece of legislation. *See* Docs. 1, 23. Plaintiff fails to allege that she is the member of any protected class or to state that the U.S. Postal Service's employment or promotion decisions were motivated by any discriminatory animus. *Id.*

The Plaintiff finds herself in the difficult situation of proceeding *pro se*.[5] However, while the Court may "construe *pro se* plaintiffs' pleadings liberally, courts may not act as *de facto* counsel or 'rewrite an otherwise deficient pleading in order to sustain an action.' " *Porter v. Duval County School Bd.*, 406 Fed. Appx. 460, 462 (11th Cir. 2010) (unpublished), quoting *GJR Invs., Inc. v. County of Escambia*, 132 F. 3d 1359, 1369 (11th Cir. 1998) (overruled on other grounds). "[T]he *Twombly* pleading standard, even when applied to *pro se* plaintiffs, simply does not permit a Court to 'reverse-engineer' a plaintiff's conclusion that [s]he is entitled to relief.

---

[5] Plaintiff has brought employment discrimination claims against the United States Postal Service on two previous occasions. The first action was brought *pro se* in 1997 alleging discrimination on the basis of race. *Reynolds v. Runyon, et al*, Civil Action No. 97-cv-00790-AH-S. The second action was brought through counsel in 2004; it alleged discrimination on the basis of age and race in determining whether to train employees for supervisor positions. *Reynolds v. Potter*, Civil Action No. 04-cv-00047-CB-C, Doc. 28 at 4. It further alleged retaliation and a hostile work environment. *Id.* at 4-5. Both cases were dismissed following motions for summary judgment by the Defendant and both dismissals were affirmed by the United States Court of Appeals for the Eleventh Circuit.

Instead, the plaintiff must plead facts and law showing why [s]he is entitled to relief. [Sh]e thus must assert non-conclusory allegations supporting the elements of [her] claims." *Washington v. CSX Transp. (R.R.)*, 2009 WL 1289032, *2 (S.D. Ga. 2009). Thus far, no "short and plain statement" has come from the Plaintiff detailing how she is entitled to the relief sought.

### IV.    Conclusion

In accordance with the above-stated analysis, the undersigned **RECOMMENDS** that:

1. The Defendant's Rule 12(b)(6) (Doc. 19) Motion to Dismiss be **DENIED** in order to allow the *pro se* Plaintiff to amend her complaint.

2. The Defendant's Rule 12(e) Alternative Motion for a More Definite Statement (Doc. 19) be **GRANTED** and the Plaintiff should be given fourteen (14) days from the adoption of this recommendation by the district judge to amend her complaint to state a claim upon which relief may be granted.

The Clerk is **DIRECTED** to serve this Order on the Plaintiff by regular and certified mail.

### V.    Notice of Right to File Objections

A copy of this report and recommendation shall be served on all parties in the manner provided by law. Any party who objects to this recommendation or anything in it must, within fourteen (14) days of the date of service of this document, file specific written objections with the Clerk of this Court. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); S.D. Ala. L.R. 72.4. In order to be specific, an objection must

identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the Magistrate Judge's report and recommendation where the disputed determination is found. An objection that merely incorporates by reference or refers to the briefing before the Magistrate Judge is not specific.

**DONE** this the **14th** day of **July 2015**.

 */s/ Katherine P. Nelson*
**KATHERINE P. NELSON**
**UNITED STATES MAGISTRATE JUDGE**